IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : CRIMINAL NO.: 07-237 |
| KIA REID | : |

**DEFENDANT'S SENTENCING MEMORANDUM**

Kia Reid, by her attorney, Catherine C. Henry, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, Defender Association of Philadelphia, Federal Court Division, respectfully submits this memorandum in order to provide information to assist the Court in fashioning a sentence under 18 U.S.C. § 3553(a) in its entirety, rather than under the Sentencing Guidelines alone, as required by *United States v. Booker*, 543 U.S. 220 (2005).

**I.     Procedural History**

On May 1, 2007, Kia Reid was charged in a one-count Information with threats interfering with federally protected activities, in violation of 18 U.S.C. § 245(b)(2)(C). On June 22, 2007, pursuant to a written plea agreement, Ms. Reid pled guilty to Count One of the Information.

**II.    Post-*Booker* Sentencing Considerations**

    A.     Procedural Requirements Post-*Booker*

The Court is no doubt familiar with the procedural requirements of post-*Booker* sentencing, as set forth primarily in the Supreme Court's recent decision in *Rita v. United States*, __ U.S. __, 2007 WL 1772146 (2007) and the Third Circuit's decisions in *United States v.*

*Cooper*, 437 F.3d 324 (3d Cir. 2006) and *United States v. Gunter*, 462 F.3d 237 (3d Cir. 2006). Briefly, sentencing courts must (1) properly calculate the Guidelines range; (2) rule on any departure motions made under the Guidelines; and (3) exercise post-*Booker* discretion by choosing a sentence in light of all relevant Section 3553(a) sentencing factors, "regardless [of] whether [the chosen sentence] varies from the sentence calculated under the Guidelines." *Gunter*, 462 F.3d at 247.

*Gunter*'s step-three, the heart of post-*Booker* sentencing, requires sentencing courts to give full consideration to all relevant provisions of Section 3553(a). While there are no "magic words" to be uttered or set formulas to be followed, the record must "demonstrate that the court considered the [Section] 3553(a) factors and any sentencing grounds properly raised by the parties which have recognized legal merit and factual support in the record." *Cooper*, 437 F.3d at 329. Thus, when presented with a non-frivolous sentencing argument, the Court must give "meaningful consideration" to both the argument itself and the Section 3553(a) factors relevant to assessing the argument. *Id.* A rote statement of the Section 3553(a) factors, even when coupled with a sentencing court's acknowledgment of the parties' arguments, is insufficient and leads to reversal. *Id.* at 329 & n.6; *United States v. Grier*, __ F.3d __, 2007 WL 315102, at *11-12 (3d Cir. Feb. 5, 2007) (*en banc*). Thus, an adequate explanation of the sentence—whether it is within or outside the Guidelines range—must be given.

  B.  <u>Determining the Appropriate Sentence Post-*Booker*</u>

While these procedural points are undisputed, Kia Reid and the government fundamentally disagree as to how the Court is to determine the appropriate sentence in this case. The government urges the Court to focus primarily on the Guidelines when determining

sentence.  Sentencing in such a Guidelines-centric manner violates *Rita, Booker*, Section 3553(a), and the Third Circuit's post-*Booker* jurisprudence.  As discussed below, the Court's statutory obligation is to impose the sentence that is minimally sufficient to accomplish the purposes of sentencing—taking into account *all* pertinent factors set forth in Section 3553(a), with no special weight afforded the Guidelines or any other factor.

        1.    *The Court Must Impose the Sentence that is Minimally Sufficient to Accomplish the Statutory Purposes of Sentencing.*

Both the Supreme Court and the Third Circuit have recognized that, post-*Booker*, Section 3553(a) is comprised of two distinct parts:  a sentencing "mandate" contained in the prefatory clause of Section 3553(a) and certain "factors" to be considered in fulfilling that mandate.  18 U.S.C. § 3553(a); *Rita,* 2007 WL 1772146, at *6; *Gunter*, 462 F.3d at 244 n.9 (distinguishing between Section 3553(a)'s mandate and sentencing factors).

Section 3553(a)'s sentencing mandate requires this Court to impose a sentence "sufficient, but not greater than necessary," to accomplish the four purposes of sentencing set forth in Section 3553(a)(2)—retribution, deterrence, incapacitation, and rehabilitation.  18 U.S.C. § 3553(a); *Rita,* at *11 (parsimony provision is a "requirement" of Section 3553(a)); *Gunter*, 462 F.3d at 244 n.9.  In determining the sentence minimally sufficient to accomplish the purposes of sentencing, the Court must consider several "factors" listed in Section 3553(a):

- the nature and circumstances of the offense and the history and characteristics of the defendant;

- the kinds of sentence available;

- the Guidelines and policy statements issued by the Sentencing Commission, including the advisory guideline range;

- the need to avoid unwarranted sentencing disparity; and

- the need to provide restitution where applicable.

18 U.S.C. § 3553(a)(1), (a)(3), (a)(5)-(7); *Rita,* at *6; *Booker*, 543 U.S. at 245; *Cooper*, 437 F.3d at 329; *Gunter*, 462 F.3d at 244 & n.9.

    2.    *District Courts Are Free to Disagree with the Guidelines and Impose a Contrary Sentence, Which Will Be Reviewed Only for Abuse of Discretion.*

*Rita* makes clear that sentencing courts are free to simply disagree with the Guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under Section 3553(a). This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the Guidelines. As the Supreme Court noted, "[a]s far as the law is concerned, the judge could disregard the Guidelines . . . ." *Rita*, at *10.

Any sentence outside the Guidelines will be reviewed only for abuse of discretion. *Rita*, at *9 ("[A]ppellate 'reasonableness' review merely asks whether the trial court abused it discretion."). The reason for this broad discretion, and for the court's ability to disagree with the Guidelines, is that district courts have a co-equal role with the Sentencing Commission. The courts are not subordinate partners in sentencing. As the Supreme Court put it in *Rita*,

> The upshot is that sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale.

*Rita*, at *7.

    3.    *Giving Any "Preference" to the Guidelines Is the Same as Applying a Presumption in Their Favor at the District Court Level, Which Both the Supreme Court and the Third Circuit Have Prohibited.*

In *Rita*, the Supreme Court made perfectly clear that district courts (unlike appellate courts) *may not* presume that a Guidelines sentence is appropriate or reasonable in any particular case:

> We repeat that the presumption before us is an appellate presumption . . . . In determining the merits of these [sentencing] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines should apply.

*Rita*, at *9. And in the Third Circuit, even after *Rita*, there is still no presumption of reasonableness for the Guidelines even at the appellate level. *Cooper*, 437 F.3d at 331-32.

Accordingly, the Third Circuit has repeatedly instructed sentencing courts to treat the Guidelines as "simply one factor" among the several co-equal sentencing factors set forth in Section 3553(a):

> The fact is that when a court sentences post-*Booker* and views all of the Section 3553(a) factors, *the guidelines range is simply one factor for it to consider in arriving at the sentence*. The guidelines range may suggest the imposition of a certain sentence of which the court should be aware but *other factors may point to a higher or lower sentence*. Consequently, so long as the court takes each of the factors into account in sentencing, it *may impose a sentence [outside the Guidelines range], provided the sentence is within the statutory range and is reasonable*.

*United States v. Colon*, 474 F.3d 95, 100 (3d Cir. 2007) (emphasis added). *See also United States v. Vampire Nation*, 451 F.3d 189, 196 (3d Cir. 2006) ("[T]he Guidelines are now only one factor among many which can influence a discretionary sentence."); *United States v. Coleman*, 451 F.3d 154, 158 (3d Cir. 2006) ("[T]he Guidelines' recommended range may be modified or disregarded by a district court upon consideration of the other sentencing factors Congress has identified in [Section] 3553(a).").

This represents a considered and significant demotion of the Guidelines in the sentencing

process. While they are still important and must be considered, the Third Circuit in *Colon* aptly summed-up the new reality by describing the Guidelines as "doubly diminished" by *Booker*: not only are they advisory instead of mandatory, but sentencing courts "must give increased attention to the other sentencing factors in Section 3553(a)." *Colon*, 474 F.3d at 97. Thus, even if the Guidelines are a "natural starting point" for the sentencing process, "that circumstance does not mean that a court must build a sentence on the Guidelines and work from there . . . ." *Id.* at 99.

The government's view that there is a "preference" for Guidelines sentencing that can be overcome only by "unusual circumstances" flies in the face of this clearly-established law. A "preference" is simply a presumption by another name. And the purported need for unusual circumstances to sentence outside the Guidelines range confuses *departures* under the Guidelines (which still require extraordinary circumstances post-*Booker*) with *variances* from the Guidelines. Variances have nothing to do with "unusual circumstances," and may be granted when departures are not only unwarranted, but even affirmatively *prohibited*. *United States v. Severino*, 454 F.3d 206, 211 (3d Cir. 2006).

Thus, it is simply untrue that the Court must find "unusual circumstances" before it may sentence below the Guidelines range.[1] The Court may, indeed *must*, sentence below the range whenever it determines that such a sentence is sufficient to accomplish the goals of sentencing. Were it otherwise, post-*Booker* sentences would be "buil[t]" on the Guidelines "to such a degree that the now-advisory guidelines tie the court's hands and, *de facto*, again become mandatory." *Colon*, 474 F.3d at 99.

---

[1] The Supreme Court recently granted *certiorari* to clarify this point. *See Gall v. United States*, No. 06-7949 (June 11, 2007).

        4.      *There Is No "Presumption of Unreasonableness" for Sentences Outside the Guidelines.*

The Supreme Court and the Third Circuit have also made clear that a sentence outside the recommended Guidelines range is not "suspect" or particularly susceptible to being reversed on appeal. To date, the Third Circuit has reversed only three below-Guidelines sentence as unreasonable.[2] This is not surprising since the Court of Appeals has effectively cut any meaningful link between what the Guidelines recommend and what will be upheld as reasonable:

> The reasonableness of a sentence depends not on the district court's adherence to the range recommended by the Guidelines or the parties, but on its adherence to the mandate of the Sentencing Reform Act to give meaningful consideration to the factors of [Section] 3553(a).

---

[2] All three cases are readily distinguishable from this one.

*United States v. Ricks*, 494 F.3d 394, (3d Cir. 2007), involved an unusual policy question, now pending before the Supreme Court in *Kimbrough v. United States*, No. 06-6330 – whether a district court may categorically reject the 100:1 crack/powder ratio incorporated in the Sentencing Guidelines to impose a below-Guidelines sentence.

*United States v. Tomko*, __ F.3d __, 2007 WL 2350765 (3d Cir. Aug. 20, 2007), on the other hand, involved unusual facts. In *Tomko*, the defendant committed "willful and brazen" tax evasion, *id.* at *12, but "did not receive so much as a slap on the wrist – it was more like a soft pat," *id*. at *5 (internal quotation marks and citation omitted). He received probation and home confinement "in the very mansion built through the . . . scheme at issue in this case – an 8,000-square-foot house on approximately eight acres, with a home theater, an outdoor pool and sauna, a full bar, $1,843,500 in household furnishings, and $81,000 in fine art." *Id.* at * 6. The majority opinion objected to "the irony of this gilded cage confinement," *id.*, and expressed concern that the sentence would "only reinforce[] the perception that wealthy defendants can buy their way out of a prison sentence." *Id.* at *12.

*United States v. Goff*, __ F.3d __, 2007 WL 2445637 (3d Cir. Aug. 30, 2007), involved the district court's failure to follow the proper sentencing procedure as outlined in *United States v. Gunter*, 462 F.3d 237 (3d Cir. 2006). On the poor record made by the district court, the Circuit found the sentence of four months in a child pornography case unreasonable. 2007 WL 2445637 at * 9. Although the Court also noted substantive problems with the sentence, it allowed that the substantive problems "are a product of the District court's procedurally flawed approach." *Id*. at *4.

*United States v. Schweitzer*, 454 F.3d 197, 204 (3d Cir. 2006).

Thus, "just as a sentence within [the Guidelines] range is not presumptively reasonable, a sentence outside of it is not presumptively *un*reasonable." *Id.* (emphasis added); *Rita*, at *11 ("The fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness.").[3] The only requirement is that the sentencing court "meaningfully consider" all relevant Section 3553(a) factors in light of the parties' non-frivolous sentencing arguments. *See Cooper*, 437 F.3d at 329; *United States v. Jackson*, 467 F.3d 834, 842 (3d Cir. 2006).

     5. *Even if District Courts Could Give the Guidelines Heightened Importance, There is No Basis for Giving Them More Weight Than Any Other Factor.*

The government claims special treatment for the Guidelines because they comprehensively examine the full panoply of sentencing considerations, represent decades of nationwide experience and study, and are the only measure for avoiding unwarranted sentencing disparities. This is little more than myth.

     a. The Guidelines Are Not Designed to Accomplish the Statutory Purposes of Sentencing and Do Not Encompass all of the Section 3553(a) Factors

While the Sentencing Commission has made a "serious effort" to reflect the objectives of Section 3553(a) in the Guidelines, *Rita*, at *7, the government grossly overstates the degree to

---

[3] Indeed, in both *Ricks* and *Tomko*, the Third Circuit emphasized that below-Guidelines sentences might be appropriate on remand. In *Ricks*, the Court only required that the sentence be supported by "individual, case-specific factors." *See* 2007 WL 2068098 at * 7. In *Tomko*, the Court clarified that its objection was to the extreme variance given: "We do not rule that any below-Guidelines sentence would have been improper in this case, only that the District Court abused its discretion in rendering this particular below-Guidelines sentence." *See* 2007 WL 2350765 at *12.

which the Commission succeeded in this endeavor. The Sentencing Commission itself acknowledged, when first promulgating the Guidelines, that it was impossible to devise a guidelines system that captures and accounts for "the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G. ch. 1, pt. A(4)(b) (1987). "[T]he guidelines are inescapably generalizations" that "say little about the 'history and characteristics of the defendant.'" *United States v. Jiménez-Beltre*, 440 F.3d 514, 527 (1st Cir. 2006) (Lipez, J., dissenting).

In the introduction to the first Guidelines Manual in 1987, the Commission acknowledged it was unable to take each of the purposes of sentencing into account in crafting the Guidelines. *See* U.S.S.G. ch. 1, pt. A(3) (1987). The Commission considered trying to account for only two purposes, which it described as "just deserts" [sic] and "crime control." *Id*. It candidly acknowledged, however, that because it was unable to tackle the "profoundly difficult" "philosophical problem" of reconciling the interplay of even *those two* sentencing purposes, it simply abandoned their use in favor of a system based "by and large, [on] typical past practice, determined by an analysis of 10,000 actual cases." Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988) (footnote omitted). As another original commissioner explained, "[r]ather than being guided by the statutory purposes of sentencing, the guideline drafting reflected simply a haphazard 'fiddling with the numbers' that established the guidelines sentences." *Dissenting View of Commissioner Paul H. Robinson on the Promulgation of Sentencing Guidelines by the United States Sentencing Commission*, 52 Fed. Reg. 18,121, 18,122 (May 1, 1987).

In the end, the Commission chose to increase sentences for some offenses, but not others,

through a series of "'tradeoffs' among Commissioners with different viewpoints." Breyer, 17 Hofstra L. Rev. at 19; *id*. at 23 ("[O]nce the Commission decided to abandon the touchstone of prior past practice, the range of punishment choices was broad"). Although the Commission may very well have done the best it could have under the circumstances, it is abundantly clear that the Guidelines ranges are *not* the product of a balancing of the sentencing purposes every judge is required to consider under Section 3553(a)(2).

In addition to their failure to take account of—much less carefully balance—each purpose of sentencing listed in Section 3553(a)(2), the Guidelines also fail to differentiate between defendants with respect to the other Section 3553(a) factors that judges must consider. Of particular note, they do not do so with respect to a vital component of subsection (a)(1)—the "history and characteristics of the defendant." From the beginning, the Guidelines have produced sentencing ranges that take into account one narrow slice of a defendant's "history and characteristics":  the aggravating factor of prior criminal history. *See generally* U.S.S.G. ch. 4. The Guidelines ranges do not incorporate any other offender characteristics or any other aspects of their history. Instead, to the extent the Commission has addressed these factors, it expressly discourages or outright prohibits judges from considering them when computing a Guidelines range or when deciding whether to impose a Guidelines sentence.[4]

Although the original commissioners "extensively debated" whether the Guidelines ranges should be affected by offender characteristics beyond the defendant's criminal record,

---

[4] These characteristics include, among others, family ties and obligations, U.S.S.G. § 5H1.6, military service, *id*. at § 5H1.11, community good works, *id*., addictions and other dependencies, *id*. at § 5H1.4, and duress relating to "personal financial difficulties and economic pressures upon a trade or business," *id*. at § 5K2.12.

Breyer, 17 Hofstra L. Rev. at 19, they were unable to reach a consensus and therefore decided "to leave other characteristics out." Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sent. R. 180, 185 (1999). Thus, as with the purposes of sentencing, it cannot be said that the Guidelines reflect a consideration of all of the sentencing factors in Section 3553(a)—particularly not the history and characteristics of the defendant.

          b.        The Guidelines Do Not Reflect Years of Experience and Empirical Study, And Instead Have Evolved Without the Benefit of Meaningful Input from District Courts

When the original Commission determined it could not base the Guidelines on a principled application of the statutory purposes of sentencing, it intended to make up for that shortcoming in later revisions to the Guidelines. The Commission saw its original product as "but the first step in an evolutionary process." U.S.S.G. ch. 1, pt. A(3) (1987). The Guidelines were to be refined along two fronts by: (1) incorporating the findings of the Commission's "continuing research, experience, and analysis," *id*. at pt. A(2); and (2) developing a sentencing "common law," whereby judges would "remain free to depart from the Guidelines' categorical sentences," transmitting their reasons for doing so to the Commission, which would then revise the Guidelines to incorporate the common practices of the judiciary. Breyer, 11 Fed. Sent. R. at 183, 185; *see also Booker*, 543 U.S. at 263.

In the early years of Guidelines sentencing, judges began the dialogue envisioned by the original Commission by departing from the Guidelines when the ranges did not adequately account for the individualized circumstances of the cases before them. But, as one commentator recently noted, "the idea that feedback from front-line sentencing actors is an important component of the federal sentencing model has somehow been lost. Instead, . . . sentences

11

outside the otherwise applicable guidelines range have come to be viewed as illegitimate, even deviant."  Frank O. Bowman, *The Year of Jubilee . . . Or Maybe Not: Some Preliminary Observations About the Operation of the Federal Sentencing System After* Booker, 43 Hous. L. Rev. 279, 321 (2006).

The Commission has also tried to impose uniformity in situations where the rate of downward departures reflects the view that a particular Guidelines range often calls for a sentence greater than necessary to serve the purposes of sentencing.  Instead of giving judges greater flexibility to take into account the factors motivating downward departures, the Commission has reacted by severely curtailing—or eliminating altogether—sentence reductions based on the cited factor.  For instance, the high rate of downward departures in career offender cases has long been a symptom of the shortcomings in that Guideline.  U.S. Sentencing Commission, *Final Report on the Impact of* United States v. Booker *on Federal Sentencing* (Mar. 2006) ("*March 2006 Booker Report*") at 137.  Part of the explanation is that the Commission's expansive definition of predicate "crimes of violence" equates defendants with truly violent histories and those who have committed much less serious offenses.  The Commission responded to these frequent downward departures from the career offender guideline by severely and categorically limiting their magnitude.  U.S.S.G. App. C, amend. 651 (2003) (limiting downward departures based on overstatement of the criminal history of career offenders to a single criminal history category).  As a result, district judges continue to find it necessary to sentence below the Guidelines range in a significant number of career offender cases.  *See March 2006 Booker Report* at 137.

Rather than demonstrating an organic and even-handed development of sentencing

practice, the amendment process has been notable for its relentless addition of factors that serve to increase offense levels and further restrict the ability of judges to consider, among other things, the history and characteristics of defendants. The Guidelines have been amended 696 times. U.S.S.G. App. C (2006). But only a handful of these changes have operated to decrease the length of sentences. *See* Amy Baron-Evans, *The Continuing Struggle for Just, Effective, and Constitutional Sentencing After* United States v. Booker*: Why and How the Guidelines Do Not Comply with § 3553(a)*, 30 Champion 32 at n.39 (2006). The cumulative effect of the remaining changes has been a "one-way upward ratchet" in sentencing. Frank O. Bowman, *The Failure of the Federal Sentencing Guidelines: A Structural Analysis*, 105 Colum. L. Rev. 1315, 1319-20 (2005).

This consistent increase in the length of prison sentences has not been accompanied by empirical data that tie the increases to the purposes of sentencing. And on the few occasions the Commission has conducted the requisite research—most notably with respect to rates of recidivism—the results often *undercut* the Guidelines.[5] The Commission's recidivism research demonstrates that many of the offender characteristics the Guidelines rule off-limits—age, educational level, employment status, and so on—are indeed strong predictors of recidivism rates. *See id*. at 16 ("Investigations using the recidivism data suggest that there are several legally permissible offender characteristics which, if incorporated into the criminal history computation, are likely to improve predictive power."). Yet the ranges computed under the Guidelines do not account for any of these offender characteristics.

---

[5] *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* ("*Measuring Recidivism Report*") at 1 (2004), *available at* http://www.ussc.gov/publicat/-recidivism_general.pdf.

       c.       The Guidelines Do Not Even Secure Meaningful Uniformity in Sentencing

Perhaps the most intuitively appealing of the government's claims is that abiding by the Guidelines is the only way to avoid sentencing disparity. But this supposed trait of the Guidelines, too, is illusory. In a number of ways, the Guidelines have perpetuated and even aggravated the problem of unwarranted disparities. As the Sentencing Commission has recognized, "unwarranted disparity" means the "different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." *Fifteen Year Report* at 113 (emphasis in original). The Guidelines, by limiting consideration of numerous factors and circumstances (including the offense and offender factors mentioned above), have increased the second type of unwarranted disparity—the like treatment of cases that are not truly alike.[6]

The Guidelines also suffer severe shortcomings in addressing the other type of disparity—different treatment of individual offenders who are similar in relevant ways. One of the biggest causes of this type of disparity is the practice of charge and fact bargaining in connection with guilty pleas. Numerous studies have confirmed that because such bargaining occurs in a sizable number of cases, Guidelines ranges for defendants who should be identical in the eyes of the Guidelines will often be different. One such study conducted by the Federal Judicial Center found that three-quarters of district judges reported that plea bargaining is a

---

      [6]      Ilene Nagel, one of the original commissioners, acknowledged this problem—she dubbed it the "overreaching uniformity" of the Guidelines—noting that "the emphasis [in creating the first set of guidelines] was more on making sentences alike, and less on insuring the likeness of those grouped together for similar treatment." Nagel, *Structuring Sentencing Discretion: The New Federal Sentencing Guidelines*, 80 J. Crim. L. & Criminology 883, 934 (1990).

"source of hidden unwarranted disparity in the guidelines system." Federal Judicial Center, *The U.S. Sentencing Guidelines: Results of the Federal Judicial Center's 1996 Survey* at 7, 9 (1997).

Congress recognized that judges would need to consider more than the kinds of unwarranted disparity against which the Guidelines can protect. It thus required them to "consider" the problem of disparity, 18 U.S.C. § 3553(a)(6), *in addition to* consideration of the Guidelines range, in each individual case. Thus, the assumption that the Guidelines account for this and other Section 3553(a) factors cannot be squared with the structure of the statute, any more than it can be squared with the way the Guidelines were created.

**III.    The Sentencing Factors as Applied to Kia Reid**

     A.     <u>Defendant's History and Characteristics</u>

Kia Reid was born on December 7, 1971, in Philadelphia, Pennsylvania, to Joseph Reid and Patricia (Parker) Reid. Ms. Reid has two siblings, Stacey Reid and Jowell Reid. Ms. Reid was 13 years old when her parents divorced in the 1980's. Ms. Reid was raised in Southwest Philadelphia. At the age of 19, Ms. Reid moved to Dam Neck, Virginia and married Ryan Lee Douglas, a member of the United States Navy. Ms. Reid has two children from this marriage, Patricia (age 18) and Ryan (age 16). Ms. Reid's marriage was extremely tumultuous. Ms. Reid states that her husband was an alcoholic, was very abusive and that she was the victim of domestic violence. They were divorced in 1996 and Ms. Reid no longer has any contact with her ex-husband. From 1993 until 2004, Ms. Reid maintained a relationship with Tracy Bynum and has one child, Kaycia Bynum (age 13) from this relationship, whom she has primary custody. Ms. Reid resides with her three children in Philadelphia, Pennsylvania and owns the home they reside since 2000. Ms. Reid has never before been arrested or convicted of any crime. Ms. Reid

is currently unemployed and is supported by her parents and child support in the amount of $181.00 per month. Ms. Reid was last employed as a sales manager at the Hampton Inn in Center City Philadelphia and was terminated in May, 2007 as a result of the negative publicity surrounding the instant offense.

### B.   Circumstances of the Offense

Ms. Reid was employed as the catering manager at the Sheraton Suites Hotel in Philadelphia, Pennsylvania, where she had worked for nearly nine (9) years, Ms. Reid had made several complaints to the personnel department about her supervisor, Nina Timani. Ms. Reid made the very poor decision to vent her dissatisfaction with her supervisor by sending the note at issue in this case. Ms. Reid sincerely regrets her actions against Ms. Timani. She bears no animosity toward Arab-Americans and practicing Muslims but recognizes the seriousness of the words in the letter she drafted. Ms. Reid wishes to repay both Ms. Timani and the Muslim community for her wrongdoing.

### C.   Guidelines Range

The guideline range is 12 to 18 months based on a criminal history category I and an offense level of 13. Undersigned counsel respectfully requests the Court impose a sentence of probation and community service.

## IV.   The Minimally-Sufficient Sentence in this Case

As discussed above, *Booker* and Section 3553(a) impose a statutory cap on sentences, no matter what is recommended under the Guidelines: the sentence must be "sufficient, but not greater than necessary" to accomplish the sentencing purposes of retribution, deterrence, incapacitation, and rehabilitation. Here, it is respectfully submitted that these purposes can be

achieved by a below-Guidelines sentence.

**V.      Conclusion**

For all of the above stated reasons, Ms. Reid requests compassion and leniency in sentencing. Therefore, counsel respectfully requests the Court impose a sentence of probation with community service.

Respectfully submitted,

_____
CATHERINE C. HENRY
Assistant Federal Defender

**CERTIFICATE OF SERVICE**

I, Catherine C. Henry, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, Defender Association of Philadelphia, Federal Court Division, hereby certify that I have served a copy of Defendant's Sentencing Memorandum, electronically through Eastern District Clerk's Office Electronic Case Filing and hand delivery, upon Jeffrey Whitt, Assistant United States Attorney, to his office located at 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106.

                                                CATHERINE C. HENRY
                                                Assistant Federal Defender

DATE: October 17, 2007